UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH
CIVIL ACTION NO. 5:14-CV-191-TBR-LLK

DAVID S. THOMAS AND
DOROTHY L. HARRIS,                                                    PLAINTIFFS

KENTUCKY ASSOCIATED GENERAL CONTRACTORS,      INTERVENOR PLAINTIFF

v.

RIVERFRONT LIMESTONE, LLC,                                            DEFENDANT

**MEMORANDUM OPINION**

This matter comes before the Court on Defendant Riverfront Limestone, LLC's, ("Riverfront"), Motion for Summary Judgment, [R. 60]. Plaintiff David S. Thomas and Dorothy L. Harris, ("Thomas"), responded, [R. 69], and Intervenor Plaintiff Kentucky Associated General Contractors also responded, [R. 68]. Riverfront replied. [R. 71.] Fully briefed, this matter is now ripe for adjudication. For the reasons stated herein, Riverfront's Motion for Summary Judgment, [R. 60], is GRANTED.

**BACKGROUND**

On a cold day in December of 2011, David Thomas, a welder and mechanic at Harold Coffey Construction, was instructed by his supervisor, Mike Hopper, to fix a safety rail on a barge owned by Riverfront Limestone. [R. 49-2 at 8, 74 (Thomas Depo.); R. 1 at 2 (Complaint).] The barge in question is a single skin tank barge built in the 1960's for transporting hazardous and flammable liquid cargo. [R. 60-2 at 5 (Haynes Report); R. 60-3 at 8 (Smith Report); R. 60-6 at 8 (Coffey Depo.).] It was purchased in 2006 or 2007 by Riverfront and converted into a dock for unloading cargo from barges, such as coal, lime, and clay. [R. 60-6 at 8; R. 60-4 at 2-3

1

(Sanders Depo.); R. 60-5 at 20 (Williams Depo.).][1] The structure is connected to land by two shore wires and a ramp by which trucks can drive onto the structure. [R. 60-6 at 4.] There is no electrical, water, or sewage connection to shore. [*Id*.] Depending on the water level of the river, the structure is occasionally moved by trackhoe and a cable between a low water ramp and mid water ramp, a distance of about thirty feet. [R. 71-1 at 2 (Coffey Affidavit); R. 69-1 at 4 (Williams Depo.), 11 (Lynch Depo.), 31 (Sanders Depo.).] Approximately once a year, the structure is moved by tugboat to a high water ramp approximately 400 feet away from the mid water ramp. [R. 71-1 at 2.] On one occasion, due to extremely low water conditions, the structure was dredged by the Army Corps of Engineers approximately 2000 feet to a different location. [*Id*. at 2-3.] On the deck is a container and equipment for unloading barges, such as an excavator, a Caterpillar "Bobcat," and a diesel powered generator. [R. 60-6 at 3; R. 49-2 at 15; R. 60-2 at 7.] The deck of the structure has a safety cable system on three sides consisting of cables threaded through stanchion pipes. [R. 49-2 at 18.] It was one of these pipes that Thomas was to repair on the day of the incident.

Repairing the stanchions of the safety rail system was nothing new to Thomas. He testified that he previously boarded the structure 75-100 times and repaired the stanchions about six times. [*Id*. at 66-67.] On the day of the incident, Thomas pulled up to the bank of the river, grabbed a tape measure, and walked out on the structure to evaluate the situation. [*Id*. at 26.] At the time, no one else was present on deck. [*Id*. at 30.] Thomas noticed some stanchions that were lying on the deck with the cables still threaded through them. [*Id*. at 29.] When Thomas picked up one of the stanchions to inspect it, his feet became entangled in the cables and he fell overboard. [*Id*. at 31.] Thomas testified that the initial shock of the cold water "rendered [him]

---

[1] To avoid confusion or an appearance of a decision as to whether it is a barge or a dock, the Court will refer to the barge/dock at hand as "the structure" hereinafter.

helpless." [*Id*. at 36.] Thomas claims that he remained in the water for approximately ten minutes. [R. 1 at 2.] During that time, Thomas alleges that "his head went under the water several times, he ingested river water and diesel fuel, and he suffered hypothermia." [*Id*.]

On October 10, 2014, Thomas filed a Complaint against Riverfront under § 905(b) of the Longshore and Harbor Workers Compensation Act, ("LHWCA"), 33 U.S.C. § 905(b). [*Id*. at 3-4.] Riverfront file a Motion for Summary Judgment on July 19, 2017, arguing that Riverfront did not owe a duty to Thomas. [R. 49-1 at 2 (First Motion for Summary Judgment).] On September 22, 2017, Riverfront filed a second Motion for Summary Judgment on the structure's status as a vessel, [R. 60], which the Court addresses in this memorandum.

**STANDARD**

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

As the party moving for summary judgment, the defendant must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of

the plaintiff's claims. Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Assuming the defendant satisfies his or her burden of production, the plaintiff "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).

## DISCUSSION

Riverfront argues that the structure where Thomas fell into the Mississippi River is not a vessel under the LHWCA, and, therefore, Thomas's claim of "negligence of a vessel" must be dismissed. [R. 60-1 at 2.] Thomas and KAGC respond that the structure is a vessel, and, therefore, § 905(b) is applicable to the matter at hand. [R. 69 at 17-18; R. 68 at 5.]

A. The LHWCA

Section 905 of the LHWCA states:

In the event of injury to a person covered under this chapter caused by the negligence of a *vessel*, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.

33 U.S.C. § 905 (emphasis added). The LHWCA does not define the term "vessel." However, in *Stewart v. Dutra Construction Co.*, the Supreme Court incorporated the definition of "vessel" provided in the Rules of Construction Act, 1 U.S.C. § 3, to be used for matters falling under the LHWCA. 543 U.S. 481, 492 (2005). That definition of "vessel" reads: "The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. In *Stewart*, the Supreme Court expounded on this definition by stating that "[s]ection 3 requires only that a watercraft be 'used, or capable of being used,

4

as a means of transportation on water' to qualify as a vessel. It does not require that a watercraft be used primarily for that purpose." 543 U.S. at 495. Furthermore, the Court stated: "Simply put, a watercraft is not 'capable of being used' for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement." *Id*. at 494. Eight years later, the Supreme Court further clarified this definition of "vessel" in *Lozman v. City of Riviera Beach* when it stated:

> And we must apply this definition in a "practical," not a "theoretical," way. Consequently, in our view a structure does not fall within the scope of this statutory phrase unless a reasonable observer, looking to . . . physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water.

568 U.S. 115, 121 (2013) (quoting *Stewart*, 543 U.S. at 496).

### B. Motion for Summary Judgment

In its Motion for Summary Judgment, Riverfront argues that although the structure is occasionally moved between ramps, [R. 71-1 at 2], any movement is incidental to its use as a dock, [*See* R. 60-1 at 13]. Thomas and KAGC both respond that the structure transports equipment used to unload barges between these ramps, and, therefore, it is a vessel. [*See* R. 69 at 18; R. 68 at 6.] The Court finds that there is no genuine dispute over any material fact regarding whether the structure is a "vessel" pursuant to the LHWCA. Under the definition incorporated in the LHWCA, the structure at hand is not a "vessel."

In *Stewart*, the Supreme Court stated that "[t]he question remains in all cases whether the watercraft's use 'as a means of transportation on water' is a practical possibility or merely a theoretical one." 543 U.S. at 496. This notion was later confirmed

once again in *Lozman*. *See* 568 U.S. at 121 ("And we must apply this definition in a 'practical,' not a 'theoretical,' way."). Thomas and KAGC argue that by moving from ramp to ramp, the structure is currently in use "as a means of transportation on water" in a practical rather than theoretical way. [R. 69 at 18; R. 68 at 5-6.] However, the question remains whether this sort of movement is the type of "transportation" meant by the statute. In rebuking the dissent's consideration of the size of the cargo carried by a floating structure, the Court in *Lozman* stated: "But a transportation function need not turn on the size of the items in question, and we believe the line between items being transported from place to place (*e.g.,* cargo) and items that are mere appurtenances is the one more likely to be relevant." 568 U.S. at 129. Granted, in the same case, the Court stated that the consideration of evidence of subjective intent should be eliminated. However, the Court continued by stating: "But we cannot agree that the need requires abandonment of all criteria based on 'purpose.' . . . And it is why we have looked to the physical attributes and behavior of the structure, as objective manifestations of any relevant purpose, and not to the subjective intent of the owner." 568 U.S. at 128. The Court continued that "[a] craft whose physical characteristics and activities objectively evidence a waterborne transportation purpose or function may still be rendered a nonvessel by later physical alterations." 568 U.S. at 129.

According to marine practices consultant Tom Smith and marine surveyor Jan Hayes, the function, or "behavior," of the structure at issue is to be a dock used as a platform for loading and unloading cargo from barges. [R. 60-2 at 5; R. 60-3 at 8.] Riverfront employees Brad Sanders and Phillip Williams both testified that this structure is used as a dock from which they unload coal, lime, clay, etc.. [R. 60-4 at 2-3; R. 60-5 at

6

20.] Although it was originally designed and built in the 1960's for the transportation of "hazardous or flammable liquid cargoes," pumping and piping equipment were since removed to eliminate the possibility of such transportation. [R. 60-2 at 5; R. 60-3 at 8.] Further modifications were made to aid in its current use as a dock, such as the installation of a ramp in its hull to accommodate trucks driving onto the structure. [R. 60-3 at 8.] According to Tom Smith, "the permanent installation of the ramp and the removal of deck fittings would make the barge unfit to tow." [R. 60-3 at 8.] Furthermore, due to these modifications and the worn thin hull plating, Tom Smith, Jan Hayes, Jerry Hammond, and Harold P. Coffey all stated that the structure is not fit for general transportation. [R. 60-3 at 7; R. 60-2 at 6; R. 60-6 at 8.] Specifically—in contrast with the interpretations of Thomas—Jan Hayes and Jerry Hammond stated in their report: "It appeared to the undersigned that the above conditions were related to and consist [sic] with excessively worn and thin plating which would apparently render the vessel unsuitable for general transportation purposes but would not exclude it from use as a captive floating dock." [R. 60-2 at 6.][2] Furthermore, despite Thomas's assertion that "[n]othing in the record indicates that the barge was completely incapable of being used to regularly transport equipment and/or people," [R. 69 at 20], Tom Smith stated in his report:

> The dock barge is not a barge that is suitable for transportation in any way. It has been converted to a fixed dock barge. . . . In order to utilize this barge for transportation of any type of cargo significant modifications would have to be

---

[2] Thomas quoted a portion of the report of Jan Hayes and Jerry Hammond that stated: "However, if it becomes necessary to move the barge to another port or location, we would recommend that the void compartments be monitored for water and/or leakage during the voyage and that several pumps be placed aboard for dewatering if necessary." [R. 60-2 at 8.] But Thomas failed to include the line immediately following that quote, which read: "This is not a recommendation we would make with a barge in service and which was fit for transportation over water." [*Id.*]

7

made. Retired barges are commonly modified to be used as dock barges when
they are no longer suitable for transporting cargo.

[R. 60-3 at 7.][3]

Neither plaintiff offers evidence or an expert to counter these statements presented by Riverfront. Rather, both plaintiffs argue that the movement of the structure between ramps, with the equipment for unloading barges on board, qualifies as "transportation" under the LHWCA. [R. 69 at 18; R. 68 at 7.] In *Baker v. Director, Office of Workers' Compensation Programs*, while finding that that an oil platform did not carry "'items being transported from place to place (*e.g.*, cargo),' but only 'mere appurtenances,'" the Fifth Circuit determined that the platform was not a vessel because transporting a crew and material was "incidental to its purpose of serving as an oil field work platform." 834 F.3d 542, 547-48 (5th Cir. 2016).[4] The platform in *Baker* is similar to the structure at hand, in which equipment used for unloading barges remains on the structure as it moves to a different ramp, but the structure at hand is moved to accommodate the water level of the river—not to transport cargo from one place to another. [R. 69-1 at 4 (Williams Depo.), 11 (Lynch Depo.), 31 (Sanders Depo.).] In other words, the structure transporting this equipment was "incidental" to the structure's function as a dock or platform for unloading barges.

Both plaintiffs also point out certain elements of the structure that could imply it is meant for transportation, including that it has a raked bow, it is not permanently attached to shore nor connected to onshore utilities, and the structure can be removed

---

[3] The Court notes that Thomas claims that the structure was moved "about once per month." [R. 69 at 2, 3, 18, 20.] The Court has read the cited statements in support of this assertion, [R. 69-1 at 4 (Williams Depo.), 30-31 (Sanders Depo.)], but neither stated that the structure was moved "about once per month."

[4] A significant amount of case law concerning this issue originated in the Fifth Circuit. As demonstrated by the cases cited in the parties' briefs, the Court is aware of little to no applicable case law detailing this issue in the Sixth Circuit.

from shore within one hour. [R. 69 at 19-20; R. 68 at 7.] First, the fact that the structure can be detached from shore rather quickly is not necessarily dispositive. The Supreme Court stated in *Cook v. Belden* that "[t]he permanence of fixation, however, is not the criterion which governs the maritime status of floating dry docks and similar structures." 472 F.2d 999, 1001 (5th Cir. 1973); *see also Lozman*, 568 U.S. at 124 ("a structure may qualify as a vessel even if attached—but not "permanently" attached—to the land or ocean floor.").[5] Furthermore, although the structure has a raked bow, it does not have the accessories of more traditional "seagoing vessels" like the dredge found to be a vessel in *Stewart* that had a "captain, crew, navigational lights, ballast tanks, and a crew dining area" and moved over water "every couple of hours." 543 U.S. at 484. Moreover, in *Lozman*, the Supreme Court emphasized that the basic difference between a case involving a structure like the dredge in *Stewart* and one that is more permanently fixed in place is that the dredge was "regularly used . . . (and designed in part to be used) to transport workers and equipment over water." *Lozman*, 568 U.S. at 125. Although the structure at hand was originally designed for transportation in the 1960's, its design was modified and it is no longer used for that function. Therefore, the structure does not fall under the definition of "vessel," and Riverfront's Motion for Summary Judgment is GRANTED.

### C. Riverfront's Other Motion for Summary Judgment

Riverfront also moves for summary judgment under the argument that plaintiffs cannot establish the existence of a duty owed to Thomas by Riverfront. [R. 49-1 at 2.] As the Court has already granted summary judgment on the grounds that the structure is not

---

[5] The Court notes that *Cook* was published before the "primary purpose test" was overruled in *Stewart*. However, that does not lessen the persuasive nature of the Supreme Court's statement that the "permanence of fixation" is not necessarily dispositive in this type of analysis.

a "vessel," as required under § 905(b), the Court finds that this additional Motion for Summary Judgment, [R. 49], is MOOT.

## CONCLUSION

For the reasons stated herein, Riverfront's Motion for Summary Judgment, [R. 60], is **GRANTED** and Riverfront's other Motion for Summary Judgment, [R. 49], is **MOOT**. The Court will enter a separate Order and Judgment consistent with this Memorandum Opinion.


cc: Counsel of Record